NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231103-U

NO. 4-23-1103

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Whiteside County |
| MICHAEL W.T. BENNETT, | ) | No. 21CF137 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Stanley B. Steines, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Harris and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction of first degree murder was affirmed. Defendant invited the two purported errors he identified on appeal, so he could not invoke the plain error doctrine. Defendant also failed to show his counsel was ineffective for (1) not objecting to the lack of foundation for a defense witness's prior inconsistent statement that was admitted as substantive evidence and (2) not requesting the jury to be instructed on second degree murder.

¶ 2    A jury found defendant, Michael W.T. Bennett, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)). The trial court sentenced defendant to 60 years in prison, including a 25-year firearm enhancement. On appeal, defendant argues plain error occurred and he received ineffective assistance of counsel because (1) the State failed to lay a proper foundation to admit a defense witness's prior inconsistent statement as substantive evidence and (2) the jury should have been instructed regarding second degree murder. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4         Addressing the claims defendant raises on appeal does not require us to recount the trial evidence in detail. We will provide a broad overview of the case while focusing on the facts relevant to the pertinent issues.

¶ 5         The evidence showed that on the evening of May 1, 2021, Olivia Sheley, who was defendant's girlfriend, drank alcohol and then walked to the home of her friend, Chasity Buckingham, in Sterling, Illinois. At some point, Joshua Hamrick, who was the father of Buckingham's child and sporadically lived at this residence, arrived. Hamrick and Sheley then used methamphetamine. Eventually, defendant arrived at this residence and entered through the front door. There was conflicting testimony as to whether Buckingham told defendant to come in or whether he forcibly entered. Shortly thereafter, Hamrick sustained two gunshot wounds. Defendant fled the scene and disposed of the gun. That night, Hamrick died from his injuries. Defendant then went to Colorado, where he was eventually arrested.

¶ 6         The State's theory of the case was that defendant brought the subject gun to Buckingham's residence and shot Hamrick, who was unarmed. The State's primary witness was Buckingham. Although she provided testimony that was generally consistent with the State's theory, she claimed she did not specifically see the shooting and did not see defendant with a gun. Buckingham also admittedly withheld information from the police about the circumstances of the shooting when she was first interviewed.

¶ 7         The defense's theory, presented primarily through the testimony of Sheley and defendant, was that defendant was unarmed and went to Buckingham's home intending to protect Sheley from Hamrick. To that end, the defense introduced evidence that (1) Hamrick had threatened to kill and rape Sheley during a recent road trip and (2) Sheley texted defendant on May 1, 2021, asking him for help and to come to Buckingham's residence. According to the defense,

when defendant entered Buckingham's residence, Hamrick immediately tried to grab a gun that was sitting on the counter. Defendant and Hamrick then struggled for possession of that gun, and defendant shot Hamrick.

¶ 8 Two neighbors testified they heard arguing or a commotion around the time of the shooting. One neighbor heard a female say something to the effect of " 'Michael, stop, I didn't do anything.' " After the shooting, the other neighbor heard a female ask, " 'Does Michael have a gun?' " and another female replied, " 'No, just a knife.' "

¶ 9 A motion-activated camera inside Buckingham's living room took numerous photographs throughout the evening of May 1, 2021. No gun is visible in any photograph, and no photograph depicted the shooting. Defendant is visible in only one photograph, which apparently was taken shortly after the shooting.

¶ 10 A. Impeachment of Sheley Through Her Prior Recorded Interview

¶ 11 Shortly after the shooting, Sheley suffered an anxiety attack and went to a hospital by ambulance. On direct examination as a defense witness, she testified she was given Ativan at the hospital, which caused her to experience "extreme nausea and memory loss." Portions of Sheley's testimony regarding the events of May 1, 2021, were inconsistent with the information she provided to a police officer at the hospital that night.

¶ 12 On cross-examination, the prosecutor asked the following questions of Sheley relevant to this appeal:

> "Q. Is it your testimony that when [defendant] entered into the residence *** on the day we've been speaking about that the gun was sitting on the kitchen counter on that island?

A. I don't remember if it was on the island or near the—like kind of near the sink. I don't really remember.

Q. But your testimony is that there was a firearm that was placed on a counter inside the residence by Joshua Hamrick?

A. Right.

Q. Do you recall giving a statement to the Sterling Police Department?

A. I do not.

Q. Do you recall speaking to a Detective Maggie Ellmaker in regards to the events of May 1st, 2021?

A. I do not.

Q. Do you know if you ever gave a statement to police?

A. I remember them coming to the hospital, but I don't remember anything that had been said. I remember the nurses telling them to leave.

Q. So they showed up to speak to you, but you don't remember if you did talk to them and if you did, you don't recall what you said to them?

A. That's correct.

Q. After the effects of the methamphetamine had worn off, did you then contact police to let them know what had happened?

A. I don't recall.

Q. To the best of your memory, any day from May 1st, 2021, up to today's date have you given a statement to the Sterling police or any other law enforcement agency in regard to these events?

A. No, I have not, no.

Q. You have not given a statement or you don't know if you've given one?

A. I have not given a statement."

¶ 13 On redirect examination, defense counsel elicited testimony from Sheley explaining why she had no recollection of speaking with a police officer on the night of the shooting:

"Q. [O]n cross-examination you were questioned about when you were at the hospital, correct?

A. Yes.

Q. And you were asked whether you had talked to the officers; is that correct?

A. Right.

Q. And while—you recall actually seeing the officers, correct?

A. I remember seeing them at the head of my bed, yes—or at the foot of my bed, I mean.

* * *

Q. *** Did you take any medication at the hospital?

A. I did, yes.

Q. And what did you take?

A. They had administered Ativan through an IV.

Q. Would that be before or after the officers arrived?

A. It was before.

Q. And had you received any side effects from the Ativan?

A. I did.

Q. And what were the side effects?

A. Extreme memory loss.

Q. *** Is that known to be a side effect of Ativan?

A. It is.

Q. How do you know that?

A. Because I've—I'm familiar with that medication and I have—

Q. And you suffered from memory loss from that Ativan; is that correct?

A. That's correct."

¶ 14 On further cross-examination, the prosecutor questioned Sheley again about her memory loss after the shooting. Sheley confirmed she attributed her memory loss to the Ativan given to her that night, not to the methamphetamine or alcohol she used earlier that night. Sheley reiterated she was taken to the hospital by ambulance after Hamrick was shot and that she did not recall giving a statement to the police.

¶ 15 On further redirect examination, Sheley testified that the police never contacted her after May 1, 2021. On further cross-examination, the prosecutor asked her, "So it stands to reason that today is the first time that you're telling your story?" Sheley responded, "That's correct."

¶ 16 After defendant rested his case-in-chief, the State called Detective Sergeant Ellmaker as a rebuttal witness. Ellmaker testified she used an application on her work-issued cell phone to audio-record an interview with Sheley at a hospital around 11 p.m. on May 1, 2021. Ellmaker identified People's exhibit No. 8 as a copy of the recording of that interview. When the State moved to introduce this exhibit into evidence, defense counsel said he had "[n]o objection."

¶ 17 The State then played for the jury Sheley's entire interview, which was 23 minutes and 34 seconds long. Sheley spent about half of the interview discussing her recent road trip with

Hamrick and Buckingham. During this portion of the interview, Sheley's story was largely consistent with her trial testimony, and she made some statements that were favorable to the defense. For example, Sheley said that during this road trip, Hamrick was armed with a few knives and hit her, threatened to kill her, and threatened to rape her. When the conversation shifted to the events of May 1, 2021, Sheley's story was partially inconsistent with her trial testimony. Most significantly, in contrast to her trial testimony, Sheley said that (1) she did not see Hamrick with a gun on the night of the shooting and (2) only Hamrick, Buckingham, and Sheley were in the house that night. Additionally, in contrast to her trial testimony, Sheley did not say during this interview that she felt threatened by Hamrick on the night of the shooting or that she texted defendant for help. During her interview, Sheley made a few other comments that could be deemed detrimental to the defense, such as claiming she was intoxicated by alcohol on the night of the shooting and that defendant had recently blamed her for their shared home being burglarized. Sheley made a few additional comments that could be deemed beneficial to the defense, including that Hamrick robbed a lot of people and had multiple warrants out for his arrest.

¶ 18          On cross-examination, Ellmaker acknowledged writing in her report that Sheley resembled someone who had used methamphetamine recently. Ellmaker further testified she knew Sheley was on Ativan when she gave her statement. Nevertheless, Ellmaker believed Sheley gave this statement of her own free will.

¶ 19                              B. Jury Instruction Conference

¶ 20                              1. *Sheley's Recorded Interview as Substantive Evidence*

¶ 21          Defense counsel tendered Defendant's Instruction No. 6, which instructed the jury it could consider prior recorded inconsistent statements as substantive evidence under certain circumstances. The trial court gave this instruction over the prosecutor's objection to some of the

language in it. The court said it believed this instruction was "in line with" section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2022)), which addresses the admissibility of prior inconsistent statements.

¶ 22    2. *Absence of Second Degree Murder Instructions*

¶ 23    For the elements instruction, the State tendered People's Instruction No. 15, which was based on Illinois Pattern Jury Instructions, Criminal, No. 7.02 (approved July 30, 2021) (hereinafter IPI Criminal No. 7.02). IPI Criminal No. 7.02 is an instruction for a first degree murder case where second degree murder is not also an issue. People's Instruction No. 15 provided as follows:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Joshua N. Hamrick; and

*Second Proposition*: That when the defendant did so,

he intended to kill or do great bodily harm to Joshua N. Hamrick;

or

he knew that his acts created a strong probability of death or great bodily harm to Joshua N. Hamrick;

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 24    Defense counsel tendered a different elements instruction as Defendant's Instruction No. 3, which was based on Illinois Pattern Jury Instructions, Criminal, No. 7.06 (approved Jan. 30, 2015) (hereinafter IPI Criminal No. 7.06). IPI Criminal No. 7.06 instructs the jury regarding first degree murder and also second degree murder based on an unreasonable belief in the need to use deadly force. However, without indicating that he was modifying this pattern instruction, defense counsel removed all references to second degree murder. Thus, Defendant's Instruction No. 3 provided as follows:

"To sustain either [*sic*] the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Joshua N. Hamrick; and

*Second Proposition*: That when the defendant did so,

he intended to kill or do great bodily harm to Joshua N. Hamrick;

or

he knew that such acts would cause death to Joshua N. Hamrick;

or

he knew that such acts created a strong probability of death or great bodily harm to Joshua N. Hamrick;

and

- 9 -

*Third Proposition*: That the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, your deliberations should end, and you should return a verdict of not guilty."

¶ 25 Thus, there were two substantive differences between People's Instruction No. 15 and Defendant's Instruction No. 3: (1) defendant's instruction erroneously included "knowing" murder, which the indictment did not charge, and (2) defendant's instruction required the State to prove defendant was not justified in using the force he used.

¶ 26 At the instructions conference, defense counsel argued Defendant's Instruction No. 3 was more appropriate than People's Instruction No. 15 because defendant's instruction required the State to prove defendant was not justified in using the force he used. The prosecutor responded that IPI Criminal No. 7.06, which was the basis for Defendant's Instruction No. 3, was designed for situations where the jury will be instructed on both first degree murder and second degree murder. The prosecutor asked, "Is the jury going to be instructed on second degree murder?" The trial court asked the prosecutor what other instruction would be used where the defendant raises affirmative defenses of self-defense or defense of others. Rather than directly answering this question, the prosecutor reiterated that IPI Criminal No. 7.06 addresses second degree murder. According to the prosecutor: "I haven't heard that anybody is asking for second degree murder, so I guess I'm a little bit confused why we're talking about an instruction for second degree murder."

¶ 27 At this point, defense counsel said, "Your Honor, in my proposed Defendant's Instruction No. 3 it does not mention second degree murder at all." Defense counsel acknowledged that the extraneous word "either" in the first sentence of Defendant's Instruction No. 3 was "an

error." Thus, defense counsel proposed the first sentence of defendant's instruction should begin: "to sustain the charge of first degree murder." The trial court asked defense counsel, "[W]here else would there be an instruction with regard to your affirmative defense of self-defense or defense of others?" Defense counsel replied that Defendant's Nos. 1 and 4 both instructed the jury about when a person is justified to use force to defend himself or another.

¶ 28 The trial court then ruled as follows:

"They're very similar. I understand. Both People's Instruction 15 and Defendant's Instruction No. 3 are refused. The People can submit a People's Instruction 15-A, which has the third proposition in it that the defendant was not justified in using the force which he used. I understand completely what [the prosecutor] is arguing, but there has to be something in the elements with regard to legal justification or without lawful justification is really what I should be saying and that is what that third proposition says."

The court asked the prosecutor whether he needed any clarification, and he responded he did not. The court added, "And you can submit it as IPI Criminal 7.02 Modified or 7.06 Modified, whichever." The court asked defense counsel whether he needed any clarification, and counsel responded he did not.

¶ 29 In response to the trial court's ruling, the State submitted People's Instruction No. 15a, which provided as follows:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Joshua N. Hamrick;

- 11 -

and

> *Second Proposition*: That when the defendant did so,
>
> he intended to kill or do great bodily harm to Joshua N. Hamrick;
>
> or
>
> he knew that his acts created a strong probability of death or great bodily
>
> harm to Joshua N. Hamrick;
>
> and
>
> *Third Proposition*: That the defendant was not justified in using the force
>
> which he used[.]
>
> If you find from your consideration of all the evidence that each one of these
>
> propositions has been proved beyond a reasonable doubt, you should find the
>
> defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these
>
> propositions has not been proved beyond a reasonable doubt, you should find the
>
> defendant not guilty."

Defense counsel told the court he had "[n]o objection" to People's Instruction No. 15a. The court thus gave this instruction, and the jury was not instructed about second degree murder.

¶ 30                    C. Verdict, Sentence, and Appeal

¶ 31        The jury found defendant guilty of first degree murder. In his posttrial motion, defendant did not raise either of the issues he presents on appeal. The trial court sentenced defendant to 60 years in prison. Defendant timely appealed.

¶ 32                        II. ANALYSIS

¶ 33            A. Foundation for Sheley's Recorded Interview

¶ 34        Defendant first argues the State failed to lay a proper foundation to admit and publish Sheley's recorded interview as substantive evidence of prior inconsistent statements. Defendant maintains the prosecutor should have asked Sheley whether she made specific inconsistent statements to Ellmaker at the hospital on the night of May 1, 2021. According to defendant, the State's failure to direct Sheley's attention to the content and circumstances of her prior inconsistent statements deprived her of the opportunity to explain herself and violated defendant's confrontation rights. Defendant also submits it was inappropriate for the trial court to admit Sheley's entire recorded interview into evidence, "rather than just the inconsistent portion of the statement the Government was seeking to highlight" (*i.e.*, Sheley's testimony that Hamrick placed a firearm on the counter before the shooting). Defendant recognizes he forfeited these issues by failing to raise them below. However, he invokes the first prong of the plain error doctrine and alleges his counsel was ineffective for failing to object to the admission of Sheley's recorded interview.

¶ 35        The State responds that the trial court properly admitted Sheley's interview into evidence. Specifically, the State contends the prosecutor "provided adequate notice to [Sheley] of the time, place, and circumstances of the earlier statement in order to give her an opportunity to explain the inconsistency." The State maintains the requirement to confront a witness with the specific contents of each prior inconsistent statement applies only where the statements were made orally and were not recorded. The State also notes that some cases have said that confronting a witness with specific inconsistent statements is unnecessary if the witness generally disavows the entire statement. Moreover, according to the State, by failing to present a cogent argument supported by citations to authority, defendant has forfeited his challenge to the propriety of admitting Sheley's interview in its entirety. Forfeiture aside, the State proposes the circumstances

justified admitting Sheley's entire interview. The State argues defendant has failed to show plain error or ineffective assistance of counsel, as the trial evidence was not closely balanced.

¶ 36        To preserve a challenge to a trial court's decision to allow extrinsic evidence of a prior inconsistent statement, a defendant must (1) object contemporaneously when the State moves to admit such evidence and (2) re-raise the issue in a posttrial motion. *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 60. Here, defendant did neither, so he forfeited his arguments. Courts have explained that "the application of the forfeiture rule 'is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence' for the first time on appeal." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 55 (quoting *People v. Woods*, 214 Ill. 2d 455, 470 (2005)). The reason is that "a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." *Woods*, 214 Ill. 2d at 470.

¶ 37        Recognizing the forfeiture, defendant invokes the plain error doctrine and alleges ineffective assistance of counsel. Notably, defendant cites no case where a reviewing court ordered a new trial based on either plain error or ineffective assistance of counsel in connection with the foundation for a prior inconsistent statement. At any rate, defendant's trial counsel said he had "[n]o objection" when the State moved to admit Sheley's recorded interview into evidence. By doing so, counsel invited any error attendant to the admission of this evidence. See *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 54 (" 'Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues.' ") (quoting *State v. Winfield*, 128 P.3d 1171, 1176 (Utah 2006)). Defense counsel also tendered Defendant's Instruction No. 6, which instructed the jury it could consider prior

recorded inconsistent statements as substantive evidence. Thus, defense counsel affirmatively invited the trial court to (1) admit Sheley's recorded interview into evidence and (2) instruct the jury to consider this recording as substantive evidence. Under these circumstances, defendant may not challenge these rulings pursuant to the plain error doctrine, and his only recourse is to argue ineffective assistance of counsel. See *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 38 ("Although inviting a ruling precludes a plain-error challenge to that ruling, a defendant may still argue that his counsel was ineffective for inviting the ruling.").

¶ 38    To sustain a claim of ineffective assistance, a defendant must show both that "(1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced defendant." *People v. Kampas*, 2020 IL App (3d) 170464, ¶ 25. In evaluating the first requirement, we must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). To satisfy the second requirement, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 39    Illinois Rule of Evidence 801(d)(1)(A)(2)(c) (eff. Oct. 15, 2015) provides that in a criminal case, a statement is not hearsay if

> "the declarant testifies at the trial or hearing and is subject to cross-examination
> concerning the statement, and the statement is
>
> > (A) inconsistent with the declarant's testimony at the trial or hearing, and—
> >
> > ***

(2) narrates, describes, or explains an event or condition of which the declarant had personal knowledge, and

\* \* \*

(c) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording[.]"

Section 115-10.1 of the Code (725 ILCS 5/115-10 (West 2022)) outlines the same hearsay rule with slightly different wording.

¶ 40    Sheley made statements in her recorded police interview that fell within the scope of Rule 801(d)(1)(A)(2)(c)—most notably that (1) she did not see Hamrick with a gun on the night of the shooting and (2) only Hamrick, Buckingham, and Sheley were in the house that night. However, as part of his argument, defendant contends laying the foundation for admitting an inconsistent statement requires the State to confront the witness with the specific contents of that statement. The State, on the other hand, maintains this foundational requirement applies only where the witness made a verbal inconsistent statement that was not audio-recorded.

¶ 41    The State acknowledges its position is in tension with our decision in *People v. Grayson*, 321 Ill. App. 3d 397 (2001), which involved an audio-recorded prior inconsistent statement. See *Grayson*, 321 Ill. App. 3d at 406 (asserting that, regardless of the form of the prior inconsistent statement, "[t]he rules governing impeachment of a witness with his prior inconsistent statement remain the same"). In *Grayson*, we explained that "a key aspect to establishing the foundation for the admissibility of a prior inconsistent statement is the need to confront the witness *while on the witness stand* with that statement." (Emphasis in original.) *Grayson*, 321 Ill. App. 3d at 406. Rejecting the reasoning of *People v. McDonald*, 276 Ill. App. 3d 466 (1995), we said that

the party laying the foundation for an inconsistent statement must confront the witness with "the *words* of his statement that constituted the alleged inconsistency." (Emphasis in original.) *Grayson*, 321 Ill. App. 3d at 408. (We note that the State here relies on *McDonald* in its appellee's brief.) The reason for this rule is to ensure that the opposing party has the "opportunity to ask the witness to explain the inconsistency, if he can." *Grayson*, 321 Ill. App. 3d at 407.

¶ 42        The foundational requirement discussed in *Grayson* is now codified in Illinois Rule of Evidence 613(b) (eff. Sept. 17, 2019), which states, in relevant portion:

> "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

The State correctly notes that the additional requirement for a witness to *acknowledge* having made a prior inconsistent statement applies only where such a statement was made orally and was not recorded. See Ill. R. Evid. 801(d)(1)(A)(2)(b) (eff. Oct. 15, 2015) (specifying that one of the requirements for admitting an unrecorded oral inconsistent statement is for the witness to acknowledge under oath having made the statement). However, the State has given us no reason to reconsider *Grayson*'s position that a party seeking to impeach a witness with a prior inconsistent statement should directly ask the witness whether he or she made the specific statement. Were it otherwise, a party could be impeached without having an opportunity to explain why or whether he or she made inconsistent statements.

¶ 43        Nevertheless, to obtain a new trial for an error he invited, defendant must do much more than just show that the State failed to lay a proper foundation for admitting Sheley's recorded interview. Rather, defendant must show he received ineffective assistance of counsel. To

demonstrate prejudice for purposes of an ineffective assistance claim, defendant must show a reasonable probability that (1) had defense counsel objected to the lack of foundation for admitting People's exhibit No. 8, the State would have been unable to correct the defect, (2) the trial court would have refused to admit that exhibit into evidence, and (3) defendant would have been acquitted. See *Aquisto*, 2022 IL App (4th) 200081, ¶ 64 (articulating similar requirements in a case where the defendant argued his counsel was ineffective for failing to object to the lack of a chain of custody for narcotics evidence).

¶ 44　　　Defendant has failed to demonstrate prejudice to sustain his ineffective assistance claim. The record does not support a conclusion that the State would have been unable to lay a proper foundation for admitting People's exhibit No. 8. We are mindful that the purpose of confronting a witness with the contents of prior inconsistent statements is to give the opposing party the opportunity to ask the witness to explain himself or herself. *Grayson*, 321 Ill. App. 3d at 407. Here, upon questioning from both the prosecutor and defense counsel, Sheley insisted she either did not make or did not remember making *any* statements to police officers, as she was under the influence of Ativan when she was hospitalized shortly after Hamrick's shooting on the night of May 1, 2021. Despite Sheley's unequivocal claim of "[e]xtreme memory loss" during her hospitalization, defendant asserts it is conceivable the prosecutor could have jogged Sheley's memory by asking her whether she recalled making specific statements to Ellmaker at the hospital on the night of May 1, 2021. According to defendant: "Perhaps, upon confrontation with the inconsistent contents of the statement, Sheley's recollection would have been refreshed, and she would have admitted having made the statement. At this point, Sheley's impeachment would have been complete, and the admission of [the recorded interview] would have become unnecessary." However, when evaluating prejudice for purposes of an ineffective assistance claim, we consider

reasonable probabilities, not theoretical possibilities. See *Strickland*, 466 U.S. at 694. In view of the totality of Sheley's testimony recounted in the background section of this disposition, we discern no reasonable probability she would have admitted to making inconsistent statements had the prosecutor confronted her with them more specifically. In other words, even if the prosecutor took the approach to laying a foundation that we approved of in *Grayson*, it is virtually certain that (1) Sheley would have continued to deny making or remembering making the inconsistent statements, (2) her prior recorded statements would have been admitted as substantive evidence, and (3) the result of the trial would have been the same. Even if Sheley were to admit having made inconsistent statements, we fail to see how that would have been helpful to the defense under the circumstances. Such an about-face after confidently testifying she never spoke to the police could have damaged her credibility more than sticking to her claim of medicine-induced memory loss.

¶ 45    This leads us to defendant's contention that the jury should have heard only the portions of Sheley's recorded interview that were inconsistent with her trial testimony. As the State notes, defendant does not cite any authority in support of this argument in his opening brief. At any rate, trial courts have broad discretion to determine which portions of prior inconsistent statements to admit. See *People v. Salazar*, 126 Ill. 2d 424, 458 (1988) (holding that a trial court acted within its discretion by admitting the entirety of a witness's recorded interview even though the witness made only a few inconsistent statements).

¶ 46    Defendant contends that some statements Sheley made in her interview were unfavorable to the defense. However, many portions of Sheley's interview were favorable to the defense. For example, Sheley repeated her allegations that Hamrick hit her, threatened to kill her, and threatened to rape her during a recent road trip. Sheley also said she previously saw Hamrick armed with knives, and she related that Hamrick had robbed people and had warrants out for his

arrest. Defense counsel could have reasonably weighed the cumulative effect of the helpful-versus-harmful statements Sheley made during her recorded interview and made the strategic decision not to object to the State's request to admit the entire interview into evidence. Thus, counsel pursued a reasonable strategy by (1) attributing Sheley's inconsistent statements to the influence of Ativan and (2) letting the jury hear Sheley's entire recorded interview to further the defense theory that Hamrick was a dangerous individual.

¶ 47        For these reasons, we hold that defendant has failed to demonstrate he received ineffective assistance of counsel in connection with the admission of Sheley's recorded interview.

¶ 48                    B. Absence of Second Degree Murder Instruction

¶ 49        Defendant also argues the jury should have been instructed about second degree murder because his trial counsel so requested. Defendant acknowledges he forfeited this issue by failing to include it in a posttrial motion, but he invokes both prongs of the plain error doctrine. Alternatively, he argues his counsel was ineffective for failing to pursue a second degree murder conviction.

¶ 50        The State responds that defense counsel never requested for the jury to be instructed about second degree murder. Moreover, the State contends defendant cannot rely on the plain error doctrine, as he affirmatively acquiesced to any error. The State further argues defense counsel's all-or-nothing strategy was reasonable and defendant cannot establish prejudice, so the ineffective assistance claim fails.

¶ 51        Second degree murder is a lesser-mitigated offense of first degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. A conviction for second degree murder is appropriate where the fact finder determines the State has proved all elements of first degree murder but a mitigating circumstance applies. *Wilmington*, 2013 IL 112938, ¶ 48. The mitigating circumstances defendant

identifies on appeal are that he either (1) acted under serious provocation or (2) unreasonably believed the circumstances justified killing Hamrick in self-defense or in defense of Sheley. 720 ILCS 5/9-2(a)(1), (2) (West 2020); 720 ILCS 5/7-1(a) (West 2020).

¶ 52        In *People v. Washington*, 2012 IL 110283, ¶ 56, our supreme court held that in a first degree murder case where the trial court instructs the jury on self-defense, the court must also instruct the jury on second degree murder *if the defendant so requests*. Here, the trial court instructed the jury on self-defense, so it would have been obligated to instruct the jury on second degree murder had defense counsel so requested. However, despite defendant's argument to the contrary, the record confirms defense counsel never requested for the jury to be instructed on second degree murder. Thus, the court did not violate the rule set forth in *Washington*.

¶ 53        Defendant asserts his counsel's failure to tender second degree murder instructions was "likely unintentional." The record does not support that conclusion. Defense counsel submitted an elements instruction as Defendant's Instruction No. 3 that was based on a pattern instruction that included second degree murder, yet counsel *removed all references to second degree murder*. At the instructions conference, defense counsel expressly acknowledged that Defendant's No. 3 did "not mention second degree murder at all." Instead of being an oversight, the record compels the conclusion that defense counsel intentionally removed the references to second degree murder from his proposed modified pattern instruction because he wanted the jury to be instructed only on first degree murder, yet he also wanted to inform the jury that the State was required to prove defendant was not justified in using deadly force.

¶ 54        Moreover, contrary to what defendant asserts, the trial court did not "flatly den[y]" Defendant's Instruction No. 3. Defense counsel convinced the court to accept much of the language of his proposed instruction, subject primarily to removing a reference to an allegation that was not

contained in the indictment. When the State submitted the finalized elements instruction as People's Instruction No. 15a, defense counsel said he had "[n]o objection." Therefore, this is not a case where an attorney merely failed to tender an instruction on second degree murder. Rather, the record suggests defense counsel was aware of defendant's right to instruct the jury on second degree murder but made a strategic decision not to do so. Under these circumstances, we determine defense counsel affirmatively invited the trial court not to instruct the jury on second degree murder, so defendant may not raise a challenge pursuant to the plain error doctrine. See *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001) (explaining that the invited error doctrine precluded the defendant from challenging the propriety of verdict forms his counsel submitted).

¶ 55 Defendant's only recourse is to argue ineffective assistance of counsel. See *Villarreal*, 198 Ill. 2d at 228. Again, "[t]o demonstrate ineffective assistance of counsel, defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that the attorney's deficient performance resulted in prejudice to defendant." *Villarreal*, 198 Ill. 2d at 228.

¶ 56 We focus on the first requirement. The elements instruction the jury received was legally accurate, so the only question is whether defense counsel acted outside the wide range of acceptable representation by not requesting to instruct the jury about second degree murder. Essentially, defense counsel pursued an all-or-nothing strategy, giving the jury two options: (1) accept defendant's affirmative defenses regarding the need to use deadly force and acquit him of first degree murder or (2) reject those defenses and convict him of first degree murder. Counsel chose not to advocate for the "middle ground" option of convicting defendant of second degree murder based on mitigating circumstances.

¶ 57 Generally, whether arising in the context of bench trials or jury trials, courts have found that decisions whether to advocate for second degree murder are matters of trial strategy that do not support claims of ineffective assistance. See *People Elsesser*, 2024 IL App (4th) 230092-U, ¶ 68 (jury trial); *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 38 (bench trial); *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) (bench trial); *People v. Benford*, 349 Ill. App. 3d 721, 729 (2004) (jury trial). An exception to the general rule excluding these types of decisions from ineffective assistance claims is where counsel's strategy was based on a misapprehension of the law. *Walton*, 378 Ill. App. 3d at 589; see *People v. Brown*, 2014 IL App (4th) 120887, ¶ 21 (reversing the summary dismissal of a postconviction petition where the defendant alleged that his decision not to request to instruct the jury on second degree murder was prompted by his counsel's erroneous representations to him regarding the applicable sentencing range for the first degree murder charges).

¶ 58 On the record before us, we are unable to say that "in light of all the circumstances," defense counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Defendant proposes that "[t]here is no explanation beyond a misapprehension of the law that would justify counsel's actions here." However, we discern no indication in the record that defense counsel misapprehended the law. Defense counsel reasonably could have determined that defendant's best option was to pursue an outright acquittal by convincing the jury he killed Hamrick either in self-defense or in defense of Sheley. Both defendant's testimony and Sheley's testimony supported those affirmative defenses. The only other surviving person in the house at the time of the shooting was Buckingham. Although Buckingham's testimony generally favored the State's version of events, she denied seeing defendant with a gun and admittedly withheld information from the police. Testimony from neighbors also arguably supported the defense's

theory that there was some sort of struggle between defendant and Hamrick before the shooting. We recognize that advocating for second degree murder would not necessarily have been inconsistent with defendant's affirmative defenses, nor would it have exposed him to what he calls "additional liability" in the same way that requesting instructions about a lesser-included offense would. See *Wilmington*, 2013 IL 112938, ¶ 48 (explaining that because second degree murder is a lesser-mitigated offense of first degree murder, not a lesser-included offense, a defendant who requests a second degree murder instruction does not expose himself to criminal liability he might otherwise avoid). Nevertheless, defense counsel reasonably could have determined that requesting the jury to be instructed on second degree murder might invite a compromise verdict that would not necessarily be in defendant's best interests. The all-or-nothing strategy was not inherently unreasonable under the circumstances. Defense counsel vigorously challenged the State's case, presented evidence on defendant's behalf, and argued forcefully in support of defendant's affirmative defenses. Although counsel's efforts were ultimately unsuccessful, nothing in the record suggests the overall strategy was so inappropriate as to constitute deficient representation.

¶ 59        Defendant asserts there is "no basis in the record upon which to conclude that trial counsel discussed a second-degree murder instruction with [him] or informed [him] of the disparate sentencing ranges for first and second-degree murder." Defendant flips the *Strickland* standard on its head. We apply a strong presumption that counsel performed his duties, not that he neglected them. *Strickland*, 466 U.S. at 689. Accordingly, "we may assume defendant decided not to tender such instruction after due consultation with counsel." *Elsesser*, 2024 IL App (4th) 230092-U, ¶ 67.

¶ 60        Accordingly, defendant's ineffective assistance claim fails.

¶ 61                                III. CONCLUSION

¶ 62          For the reasons stated, we affirm the trial court's judgment.

¶ 63          Affirmed.